UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                      :

**MALVIA M. FRECKLETON**,

                       Plaintiff,

           – against –

**AMBULNZ NY LLC**,

                      Defendant.

--------------------------------------------------------------- X

:   **MEMORANDUM DECISION AND ORDER**

:   21-CV-4615 (AMD) (CHK)

**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings this employment discrimination action against Ambulnz NY LLC, alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* Before the Court is the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the defendant's motion is granted.[1]

## BACKGROUND

### I.   Factual Background[2]

The defendant provides mobile healthcare services in New York City and Long Island. (Pl. 56.1 ¶ 1.) In March 2019, the defendant hired the plaintiff as an EMT. (*Id.* ¶¶ 11, 13.) The

---

[1] The plaintiff's counsel have represented the plaintiff *pro bono* through discovery and summary judgment. The Court commends counsel for their fine work on the plaintiff's behalf.

[2] The factual background is based on the Court's review of the record submitted by the parties, although parts of the record are incomplete. The Court has reviewed record citations in the defendants' Rule 56.1 statement (ECF No. 89-2 ("Def. 56.1")), as well as the plaintiff's Rule 56.1 counterstatement, which includes the plaintiff's responses and objections to the defendant's Rule 56.1 statement and additional facts which the plaintiff contends are material and undisputed (ECF No. 91-1 ("Pl. 56.1")). The Court has also reviewed the defendant's reply to the plaintiff's statement of additional material facts (ECF No. 92-1 ("Def. 56.1 Reply").) All citations to these documents incorporate the responses and objections of the opposing party. Most citations are to ECF No. 91-1, Pl. 56.1, as that document includes the defendant's statement of material facts, as well as the plaintiff's objections and counterstatement of

plaintiff had an EMT license and relevant training, including volunteer experiences in nursing school. (*Id.* ¶ 12.) When she was hired, the plaintiff was authorized to drive an ambulance, which she knew would be one of her duties. (*Id.* ¶¶ 10–11.) The defendant's national and local employee handbook, which the plaintiff received during her orientation, outlined the EMT's job duties, responsibilities and requirements. (*Id.* ¶¶ 19–21.)

At first, the plaintiff worked at the defendant's Inwood location, where she was on call between 40 and 80 hours a week. (*Id.* ¶¶ 24, 27.) Almost immediately, the plaintiff and her colleagues struggled to work together. By August 2019, the plaintiff had filed at least four formal complaints against her co-workers (ECF No. 89-14; ECF No. 89-16; ECF No. 89-17; ECF No. 89-18), and at least two of the plaintiff's co-workers complained about her (ECF No. 89-15; ECF No. 89-19 at 8). In broad strokes, the complaints, both by and against the plaintiff, alleged unprofessional behavior. (*See id.*, Pl. 56.1 ¶¶ 33–37.)

These disputes culminated in an argument between the plaintiff and a co-worker on August 5, 2019. The plaintiff and her assigned partner received a dispatch call, but the plaintiff did not hear the address or the zip code. (ECF No. 89-11, Transcript of Plaintiff's Deposition ("Pl. Dep.") 102:13-20.) The plaintiff asked her partner to repeat the address, but he refused and said it was not his job to babysit the plaintiff. (Def. 56.1 Reply ¶ 134.) They continued to argue, and the plaintiff's partner said that he did not want to work with the plaintiff anymore. The plaintiff called the dispatcher, who cancelled the emergency call. Next, she tried to call Samuel Mezrahi, the defendant's General Manager, but he did not answer. Finally, she called Josephine DeLaPaz from Human Resources, who told the plaintiff and the co-worker to return to the base

---

facts. In addition, the Court has reviewed transcripts of the plaintiff's deposition and of her meetings with the defendant's leadership team, as well as the other cited exhibits. The Court construes the facts in the light most favorable to the plaintiff, the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2015).

for a meeting with Mezrahi.  (Pl. Dep. 103:13–114:7.)  Just before the meeting started, the plaintiff emailed Mezrahi that "supervisors and male worker[s]" "discriminated against and bullied" her.  (*Id.* 104:2-7, 104:21-25; ECF No. 91-7.)  Then, Mezrahi met with the plaintiff and her partner, and suspended them both.  While the record is unclear, either Mezrahi or DeLaPaz reversed the plaintiff's suspension within hours.  (Pl. Dep. 104:21–105:15, 106:21–107:18.)

After the meeting, Mezrahi replied to the plaintiff's email, and said that he "would like to launch an immediate investigation."  (ECF No. 91-7.)  The next day, the plaintiff emailed Mezrahi again, and described her issues with co-workers at the Inwood location.  She said that it was "not fair [that] . . . 2 friends who are Par[a]medics decided to railroad [her to] get[] the [privilege] to abort [her] shifts."  (ECF No. 89-20 at 2–3.)  She also wrote that she "strongly feel[s] that Ambulnz is now retaliating by sending [her] to the Brooklyn Location."  (*Id.*)  Mezrahi replied that under the circumstances, and specifically because the plaintiff said that "all the supervisors/managers are discriminating and bullying" her, "it is in [her] and the compan[y']s best interest" that the plaintiff work out of the Brooklyn location until "the investigation is completed."  (*Id.* at 2–3.)

The plaintiff started to pick up shifts at the Brooklyn base, although she also continued to work from the Inwood base.  (Pl. 56.1 ¶ 44.)  Over the next several weeks, the plaintiff worked consistent hours and received the same salary.  (*Id.* ¶¶ 45–50.)  Nothing in the record reflects any formal investigation into the plaintiff's allegations.  (Def. 56.1 Reply ¶ 138.)

Meanwhile, the plaintiff was dealing with a separate work issue.  On August 9, 2019, a New York State trooper stopped her and told her that her license had been suspended since May

24, 2019.  (Pl. Dep. 132:3-25; Pl. 56.1 ¶¶ 51–52.)[3]  This meant that she had been driving the defendant's ambulance while her license was suspended, which she was not permitted to do.  (*Id.* ¶ 52.)  The plaintiff told her supervisors, who notified the defendant's risk management department.  (*Id.* ¶¶ 53–55.)

On August 12, 2019, the plaintiff went to the Department of Motor Vehicles and received a restricted license, which she thought would permit her to continue driving the ambulance.  (Pl. 56.1 ¶ 56.)  She was mistaken.  The defendant suspended the plaintiff for one week "pending investigation."  (*Id.* ¶¶ 57–58.)  On August 16, 2019, during her suspension, the plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC").  (*Id.* ¶ 64.)  NYSDHR informed the plaintiff that they would notify the defendant of the complaint.  The plaintiff did not tell anyone at work that she filed the complaints.  (*Id.* ¶ 65.)

The plaintiff returned to work after a week and continued to work regular hours.  (*Id.* ¶¶ 62–63.)  However, her job "was too stressful" and her "anxiety was too high."  (*Id.* ¶ 67.)  Accordingly, on September 3, 2019, she asked the defendant to change her status from full-time to part-time or per diem status, effective September 9, 2019.  (*Id.* ¶ 66.)  The defendant granted that request.  (ECF No. 89-7, DeLaPaz Dep. Tr. 111:20–112:7.)  The defendant learned about the plaintiff's NYSDHR complaint a few days later, around September 11, 2019.  (Pl. 56.1 ¶ 68.)

On September 15, 2019, the plaintiff emailed Mezrahi and DeLaPaz asking to meet with them as soon as possible to discuss a "[h]ostile work environment with Co-worker[s]."  (ECF No. 89-28; Pl. 56.1 ¶ 69.)  The plaintiff said that her coworkers were "hindering [her] from

---

[3] It appears that the plaintiff's license was suspended because she registered her car in New York, but her insurance was issued from Pennsylvania.  (*See* ECF No. 89-23.)

performing [her] duties at work proficiently," including on the previous day, when her coworkers at Inwood "arrange[d] to plot against" her and caused her not "to complete patient care on [her] shift." (ECF No. 89-28.)

Members of the defendant's leadership team met with the plaintiff on September 17, 2019. (Pl. 56.1 ¶ 71.) Michael Witkowski, the defendant's Chief Compliance Officer, asked the plaintiff to explain what had been happening because he had not received or reviewed the individual incident reports that the plaintiff had filed in the previous months. (*See* ECF 89-30 at 3–7.)[4] The plaintiff described some of the incidents with her coworkers, which she had previously reported. (Pl. 56.1 ¶ 72.) They also discussed the plaintiff's suspended license and her one-week suspension. (*Id.* ¶ 73–74.)

Witkowski told the plaintiff that she was "a very good employee," and that the defendant "want[ed] good employees," so he "need[ed] to figure out a way" to allow the plaintiff to keep working while the defendant investigated her discrimination claims. (ECF 89-30 at 31–32.) Witkowski proposed that the plaintiff transfer to the medical billing department, at least while the defendant investigated her allegations. (Pl. 56.1 ¶¶ 75–77.) He said that the transfer would be short term, and that he wanted to make sure she did not suffer financially during the investigation. (*Id.* ¶¶ 77, 81.) In addition, he told the plaintiff that she could stay in the medical billing department if she liked the job, but could go back to being an EMT if she wanted to do that. (*Id.* ¶¶ 76, 78.)

---

[4] Derek Rapisarda, the defendant's Vice President of Compliance and Regulatory Counsel, summarized the conversation in a memorandum dated September 20, 2019 (ECF No. 89-29), and the plaintiff recorded and transcribed the conversation (ECF No. 89-30). For the purpose of deciding this motion, the Court credits the reliability of this transcript and the transcript of the September 19, 2019 meeting (ECF No. 89-31), which the plaintiff produced and which she testified were true and accurate reflections of the conversations. (*See* Pl. Dep. 162:6–163:7, 181:3–182:5.)

This was not the only potential solution that Witkowski proposed.  For example, when the plaintiff said that she wanted to work in Philadelphia, Witkowski asked if that was still an option because he could have her working fulltime in Philadelphia as an EMT "in an hour or two hours." (ECF No. 89-30 at 35.)  Witkowski explained that she "would not be interacting with any of the management from New York altogether," which "would be ideal." (*Id.* at 36.)  The plaintiff responded that it would be too hard to travel to Philadelphia, so Witkowski continued trying to "figure out a way to get" the plaintiff a role in the corporate office. (*Id.*)

The plaintiff agreed to work the medical billing department.  She maintains, however, that she agreed under "immense pressure." (Pl. 56.1 ¶ 79.)  She also says that Witkowski's offer was informal and that they did not discuss details of the transfer, including her schedule and wages. (Pl. Dep. 160:11–161:13, 165:11-17.)  She understood that the transfer would be "just a temporary situation," and that Witkowski "was just going to let [her] work until when they were able to do the investigation." (*Id.* 160:19-21, 193:18-23.)  The plaintiff "never signed a document" or otherwise formalized the transfer. (*Id.* 193:18-23.)  The plaintiff received the same wage in the billing department that she got as an EMT — $15 an hour. (Pl. 56.1 ¶ 89)

On September 18, 2019, the plaintiff reported to the medical billing department. (*Id.* ¶ 93.)  She was familiar with the some of the forms from working as an EMT but had no experience or training in medical billing. (*Id.* ¶¶ 92, 94.)  She felt immediately "ostracized" because her desk was far from the other workers in the department. (Pl. Dep. 168:4-20.)  Nonetheless, she completed the work assigned to her, and her supervisor, Sylvia Vincenty-Rodriguez, complimented her on how quickly she got it done. (Pl. 56.1 ¶¶ 95–96.)  The plaintiff believed, however, that this job was a "harder task" than being an EMT, and it was "the most stressful thing [she's] ever done in [her] entire life." (Pl. Dep. 178:10, 194:6–7.)

The plaintiff returned to the billing department the next day, on September 19, 2019.  (Pl. 56.1 ¶ 99.)  There was a group meeting, to which the plaintiff was not invited.  After the meeting, other employees refused to talk to her, except for an employee who told the plaintiff that the Vincenty-Rodriguez instructed employees not to speak with her.  (Def. 56.1 ¶¶ 149–50.)

Later that day, Vincenty-Rodriguez told Rapisarda and Anthony Hicks, an HR representative, that the plaintiff had been discussing her discrimination complaint with employees in the department.  (Pl. 56.1 ¶¶ 99–100.)  Rapisarda and Hicks met with the plaintiff, who insisted that she had not said anything to other employees.  It was Vincenty-Rodriguez who asked the plaintiff about her complaints; the plaintiff told her that she could not "get into details."  (*Id.*)  Rapisarda assured the plaintiff that she had not done anything wrong and that the purpose of the meeting was to find a solution so that the plaintiff could work in a comfortable environment.  (*Id.* ¶¶ 101, 104–05.)

Nevertheless, the plaintiff got extremely upset, and felt "as if [she] was having a panic attack."  (Pl. Dep. 172:4-21.)  She said that "the corporate office [was] more hostile than" the work environment at the EMT bases and that she did not want to return; she told them to use Vincenty-Rodriguez's report as grounds to fire her.  (*Id.*)  Rapisarda and Hicks replied that they did not want to fire her, that they had no reason to fire her, and repeatedly asked what they could do to make her more comfortable at work.  (*Id.* 184:5-23; Pl. 56.1 ¶¶ 104–105, 108–109, 110.)  The plaintiff then asked to leave for the day; Rapisarda and Hicks said that they hoped she would return the following day, but the plaintiff said that she would not.  (Pl. Dep. 185:7-15; Pl. 56.1 ¶ 111.)

The plaintiff did not return to work the next day, September 20, 2019, or ever again.  (*Id.* ¶ 113.)  She maintains that she did not quit her job, because the medical billing department job

"was just a temporary situation." (Pl. Dep. 193:17-23.) On September 27, 2025, the defendant

sent the plaintiff a termination letter, which reads in relevant part:

> As of September 25, 2019, you have been absent from work for three (3) days without any notification. Because your absence has not been approved and we have not heard from you, we have determined that you have abandoned your position.
>
> In accordance with our policy on absences and established company procedure, effective today, September 27, 2019 is the date of your termination.

(ECF No. 89-33.)[5] At the time of the plaintiff's termination, the defendant had not begun an

investigation into her discrimination claims.

## II.    Procedural Background

On October 17, 2019, the plaintiff filed another complaint with the NYSDHR, alleging

retaliation. On January 14, 2020, the NYSDHR dismissed the plaintiff's initial discrimination

complaint. The plaintiff's retaliation complaint was dismissed on July 28, 2020. (Pl. 56.1

¶ 119.)

On August 16, 2021, the plaintiff brought this action, alleging employment

discrimination and retaliation by the defendant. (ECF No. 1.) The Court granted in part and

denied in part the defendant's motion to dismiss for failure to state a claim, dismissing all the

plaintiff's claims for discrimination but allowing her retaliation claims to proceed. (ECF No.

51.) After discovery closed, the defendant moved for summary judgment. (ECF No. 89.) The

plaintiff opposes the motion. (ECF No. 91.)

## LEGAL STANDARD

Summary judgment is warranted only if the submissions, including deposition transcripts,

affidavits, or other documentation show "that there is no genuine dispute as to any material fact

---

[5] The plaintiff says that she contacted someone in the HR department. The defendant denies this claim.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute arises when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under governing law" qualify as "material," and "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment. *Id.* The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Strass v. Costco Wholesale Corp.*, No. 14-CV-6924, 2016 WL 3448578, at *2 (E.D.N.Y. June 17, 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"In considering a motion for summary judgment, the district court must draw all inferences in favor of the non-moving party, and may [grant summary judgment] only if the record reveals no genuine issue of material fact for trial." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023) (internal quotation omitted). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (cleaned up). The moving party cannot prevail on summary judgment "if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Banks*, 81 F.4th at 258 (quoting *Anderson*, 477 U.S. at 248).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Given the "'elusive nature of intentional discrimination,' plaintiffs must often 'rely on bits and pieces of information to support an inference of discrimination.'" *Banks*, 81 F.4th at 259 (cleaned up) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015)).

Accordingly, "[b]ecause of the likelihood that 'direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* (cleaned up) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). "The resulting 'mosaic of intentional discrimination' may be sufficient to show discrimination." *Id.* (cleaned up) (quoting *Vega*, 801 F.3d at 86). "Nonetheless, even in the discrimination context, a plaintiff must still present more than conclusory allegations to survive a motion for summary judgment." *Id.* (citing *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 92 (2d Cir. 1996)).

## DISCUSSION

"Title VII prohibits an employer from discriminating against an employee because the employee has engaged in protected activity." *Banks*, 81 F.4th at 275.[6] "The purpose of this 'antiretaliation provision' is to 'prevent[ ]' employers from interfering 'with an employee's efforts to secure or advance [the] enforcement' of Title VII's basic protections against discrimination." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "[T]he *McDonnell Douglas* framework applies to retaliation claims . . . brought under . . . Title VII." *Carr v. New York City Transit Auth.*, 76 F.4th 172, 178 (2d Cir. 2023). To establish a Title VII retaliation claim, an employee must show that: "(1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Id.* at 180. "The plaintiff's burden in this regard is

---

[6] The parties agree that the plaintiff's Title VII and ADEA claims arise from the same facts and are analyzed under the same standard. Accordingly, the Court does not distinguish between the two claims.

'*de minimis*' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005)). "Once a *prima facie* case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2013) (citation omitted). If the employer makes this showing, then the burden shifts back to the plaintiff to establish "that the reason offered by the employer is merely pretext, and that the employer's 'desire to retaliate' was the actual 'but-for cause of the challenged employment action.'" *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14 (2d Cir. 2018) (quoting *Ya–Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015)).

## I.  Title VII Prima Facie case

The defendant does not dispute that the plaintiff engaged in protected activity when she filed her first complaint with the NYSDHR, alleging employment discrimination. (ECF No. 89-1 at 10.) Instead, the defendant says that the actions that the plaintiff challenges were not materially adverse, and that in any event, there was no causal connection between the protected activity and the alleged retaliatory conduct. (*Id.*) As explained below, the plaintiff has established a *prima facie* case of retaliation.

### a.  Materially Adverse Action

The plaintiff must show that the defendant took a materially adverse action against her. In this regard, she must demonstrate that the employer's actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). "[P]etty slights, minor annoyances, and simple lack of good manners will not" usually constitute adverse

11

actions under this standard.  *Id.* at 68.  The question is solely "whether the actions, taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination."  *Carr*, 76 F.4th at 181; *see also Hicks*, 593 F.3d at 165 ("[T]he alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006))).  "This standard is plainly an objective one," but "in identifying materially adverse employment actions, 'context matters,'" and "an act that would be immaterial in some situations is material in others."  *Moll*, 94 F.4th at 239, 243 (quoting *Burlington N.*, 548 U.S. at 69).[7]

The plaintiff asserts that three related actions constitute materially adverse employment actions: (1) transfer to the medical billing department, (2) termination, and (3) constructive discharge.  (ECF No. 91 at 12.)

### i.  *Temporary Transfer to Medical Billing*[8]

"Reassignment of job duties may constitute a materially adverse employment action." *Rios v. Max Mara USA Inc.*, No. 23-CV-9839, 2025 WL 66502, at *12 (S.D.N.Y. Jan. 10, 2025) (citing *Burlington N.*, 548 U.S. at 71).  "However, '[w]hether a particular reassignment is

---

[7] As the plaintiff notes (ECF No. 91 at 11 n.3), although the retaliation standard "covers a broader range of conduct than does the adverse-action standard for claims of discrimination," *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 517 (E.D.N.Y. 2019), the Supreme Court explained in *Muldrow v. City of St. Louis, Missouri*, that it did not change the "materially adverse" standard in a retaliation context by holding that an adverse employment action under Title VII is an action that imposes "some harm respecting an identifiable term or condition of employment," which "left [the plaintiff] worse off," 601 U.S. 346, 348 (2024).

[8] According to the defendant, the Court "previously rejected these allegations as insufficient to sustain Plaintiff's retaliation claim."  (ECF No. 89-1 at 11 n.3.)  However, the Court's decision on the motion to dismiss, as framed by the pleading, is not controlling at the summary judgment stage.  *See* Wright and Miller, 10A Fed. Prac. & Proc. Civ. § 2721 (4th ed.) ("[T]he formal issues framed by the pleadings are not controlling on a motion for summary judgment; the court must consider the issues presented by the other materials offered by the parties on the motion to determine whether the Rule 56 request should be granted.").

materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006)).

The plaintiff argues that her transfer to the medical billing department was a materially adverse employment action because her job as a medical biller "differed substantially" from her work as an EMT. (ECF No. 91 at 13.) She also maintains that her role in the medical billing department was not simply different, but "substantially less prestigious than the life-saving work she performed as an EMT;" indeed, the plaintiff describes the transfer as a demotion. (*Id.* at 13–14.) Moreover, she claims that she was untrained and ill-suited for the position. (*Id.*)

The defendant responds that the transfer was temporary, and that the plaintiff agreed to be transferred while the defendant investigated her allegations of discrimination at the EMT bases. (ECF No. 92 at 2–3.) Additionally, the plaintiff received the same wage after the transfer, and the goal of the transfer was to allow the plaintiff to continue to earn a salary during the defendant's investigation. (*Id.*) The defendant argues that under these circumstances, the transfer would not dissuade a reasonable employee from making a complaint.

The temporary nature of the reassignment, and the circumstances in which the defendant suggested it, both support the defendant's position. In the context of discrimination claims under Title VII, "courts in this circuit have regularly held that *temporary* reassignments which do not impact an employee's salary or benefits do not constitute an adverse employment action." *Freeman v. Dep't of Env't Prot.*, No. 10-CV-1555, 2013 WL 817221, at *5 (E.D.N.Y. Feb. 5, 2013) (emphasis in original), *report and recommendation adopted,* 2013 WL 801684 (E.D.N.Y. Mar. 5, 2013). *See also Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 329

(S.D.N.Y. 2020) (collecting cases).  In general, this logic applies with equal force to a claim for retaliation; "indisputably temporary" transfers that have "no lasting adverse effect . . . are not the sort of 'material' adverse actions that suffice for claims for retaliation."  *Jackson v. Syracuse City Sch. Dist.*, No. 19-CV-1188, 2025 WL 255399, at *9 (N.D.N.Y. Jan. 21, 2025) (quoting *Vega*, 801 F.3d at 85).

The parties agree that Witkowsky told the plaintiff that the transfer would be temporary. (Pl. 56.1 ¶ 77.)  He said that her work in the medical billing department was a short-term solution so that the plaintiff did not suffer financially while the defendant investigated her allegations. (*Id.*)  The plaintiff understood the arrangement.  (Pl. Dep. 193:18-23.)⁹  As a practical matter, the defendant had few alternatives.  The plaintiff had filed complaints about many of the individual EMTs with whom she worked and accused nearly all her supervisors of discrimination.  It would not have been feasible, under these circumstances, to reassign everyone the plaintiff accused of misconduct.  Instead, the defendant offered the plaintiff an opportunity to continue working at the same wage, while they investigated these allegations, and told the plaintiff that she would be able to return to her EMT role if she wanted.

To be sure, the plaintiff's work responsibilities changed significantly once she transferred.  Instead of driving an ambulance and responding to medical emergencies, the plaintiff was working in a "light-duty" role at a corporate office (Pl. 56.1 ¶¶ 84–88); the fact that the plaintiff had to do similar paperwork in both positions does not erase the differences between

---

⁹ The parties dispute whether the plaintiff voluntarily agreed to the transfer.  "A plaintiff who voluntarily transfers is not precluded from establishing a *prima facie* case of retaliation, but she may face a higher bar in doing so."  *Mulligan v. Town of Hempstead*, No. 21-CV-964, 2024 WL 84829, at *8 (E.D.N.Y. Jan. 8, 2024) (internal citation omitted)).  The plaintiff did not object to the transfer when the defendant offered it to her, and she reported to the billing department.  (Pl. Dep. 161:11–62:13, 166:11-17.) However, a reasonable trier of fact could conclude that the plaintiff agreed to the transfer "only to make the best out of a bad situation."  *Mulligan*, 2024 WL 84829, at *8.  Accordingly, the plaintiff need not clear "a higher bar" in asserting her *prima facie* claim for retaliation.

them.  Drawing all inferences in the plaintiff's favor, there is at least a material dispute about whether the new role was "materially less prestigious, materially less suited to [her] skills and expertise, or materially less conducive to career advancement."  *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 273 (2d Cir. 2023) (internal citation and quotation omitted); *see also Lore v. City of Syracuse*, 670 F.3d 127, 170 (2d Cir. 2012) (holding that a reasonable juror could find that a transfer from one department to another less prestigious department was a materially adverse employment action).

But while this transfer might support a claim for retaliation if it were permanent, there is no genuine dispute that the defendant reassigned the plaintiff temporarily; indeed, the plaintiff conceded that she understood the billing work to be "a temporary situation."  (Pl. Dep. 193:18-19.)[10]

Nevertheless, the plaintiff insists that the transfer was not temporary.  First, she argues that the defendant did not provide an end date (ECF No. 91 at 13), and "[t]here was no timeline" or "money agreement."  (Pl. Dep. 160:17-24).  Moreover, the parties agree that Witkowski told the plaintiff that she could continue working in the medical billing department if she preferred.  (Pl. 56.1 ¶ 76.)  Second, the plaintiff avers that to the extent the duration of the transfer depended on the purported investigation, "not a single witness was able to testify to the investigation's status or process or that it was anticipated to end any time soon."  (ECF No. 91 at 14.)

---

[10] The plaintiff agrees that Witkowski told her that the transfer would be short term, but says that she did not believe him.  (*Id.*)  The record, including the testimony that she cites in support of her position, says otherwise.  (*See* Pl. Dep. 161:10-13 ("Q. So you understood it to be short term while they investigated your complaint; correct?  A.  It was temporary because they told me every day to come back around 8:30.").)  And even by the plaintiff's definition, courts have found that a "reassignment was temporary" when it "last[ed] only a day each time Plaintiff was reassigned."  *Scott v. N. Manor Multicare Ctr., Inc.*, No. 15-CV-2495, 2018 WL 1627270, at *14 (S.D.N.Y. Mar. 30, 2018).

Neither argument is persuasive.  The plaintiff conflates an indefinite transfer with a permanent transfer, suggesting that a temporary transfer must have a predetermined end date that is "soon."  While an indefinite transfer may — and, in fact, often will — mean a permanent transfer, this case offers an exception to the typical situation.  The problem with the plaintiff's argument is that the parties both understood the reassignment to be temporary before it began, and it became indefinite only once the plaintiff stopped coming to work.

For similar reasons, the plaintiff's reassignment was not permanent simply because the defendant had not started the investigation within a few days of learning about the plaintiff's allegations.  Witkowski told the plaintiff that he and the defendant's other corporate representatives learned of her allegations on September 17, 2019 — the same day he suggested that she transfer to the billing department temporarily.  (*See* ECF 89-30 at 3–7.)  According to Rapisarda's memorandum, at least some members of the defendant's compliance department learned of the NYSDHR complaint on September 11.  (ECF No. 89-29.)  The plaintiff worked her last day for the defendant on September 19, 2019.  Even assuming that the defendant had not taken any steps to begin its investigation, it does not follow that the reassignment was permanent or that the defendant would never have conducted the investigation, and the plaintiff does not argue that the defendant was obligated to begin the investigation immediately.  Moreover, there is no particular period of time that makes a reassignment temporary.  *See, e.g.*, *Mayo-Coleman v. Am. Sugars Holding, Inc.*, No. 14-CV-79, 2017 WL 4157379, at *11 (S.D.N.Y. Sept. 18, 2017) (temporary two-week transfer not adverse employment action); *Hardy v. Pepsi Bottling Co. of New York, Inc.*, No. 14-CV-4007, 2016 WL 1301181, at *6 (S.D.N.Y. Mar. 31, 2016), *aff'd*, 690 F. App'x 60 (2d Cir. 2017) (same for temporary transfer that lasted "a few months"); *Martinez v.*

*New York City Dep't of Educ.*, No. 04-CV-2728, 2008 WL 2220638, at *10 (S.D.N.Y. May 27, 2008) (same for transfer that lasted the summer).

Were this the entirety of the relevant consideration, the plaintiff's temporary reassignment would not dissuade a reasonable employee from filing a complaint and would not be a materially adverse employment action. However, the Second Circuit has instructed courts to consider alleged acts of retaliation "in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks*, 593 F.3d at 165 (internal citation omitted). Therefore, the Court must consider not only the fact of the transfer but the conditions in the billing department.

The plaintiff alleges that the defendant moved her to a department in which she was isolated — both physically and socially — while they investigated the plaintiff's claims of discrimination. (Pl. Dep. 169:4-20; Def. 56.1 ¶ 150.) In addition, the plaintiff claims that her manager instructed her coworkers not to speak to her. (Pl. Dep. 171:8-15.) The plaintiff also maintains that the temporary assignment was the most stressful job of her life, in part because she was not trained for it. (Def. 56.1 ¶ 149.) Finally, the plaintiff believed that her manager in this position was "lying" to her supervisors about the plaintiff's conduct, presumably to get her in trouble. (Pl. 56.1 ¶ 102.) Drawing all reasonable inferences in the plaintiff's favor, these circumstances, in the aggregate, could dissuade an employee from filing a complaint.

Accordingly, although the plaintiff's temporary reassignment is not *per se* actionable, the defendant's conduct in the aggregate is sufficient to support the plaintiff's *prima facie* case of retaliation.

### ii.    Termination

The plaintiff argues that even if the temporary transfer was not a materially adverse employment action, the defendant's decision to terminate her satisfies that element of her *prima*

17

*facie* case.  (ECF No. 91 at 15–16.)  "There is no question the idea of being fired might 'dissuade' a reasonable employee from reporting discrimination under Title VII."  *Pardo v. Tomas Infernuso DVM, P.C.*, No. 24-CV-190, 2024 WL 4276204, at *6 (E.D.N.Y. Sept. 24, 2024) (quoting *Burlington N.*, 548 U.S. at 57).  The parties dispute, however, whether the plaintiff resigned her position voluntarily.  The defendant argues that she did (ECF No. 89 at 14), and contends that "a voluntary resignation is not an adverse employment action unless the employee was constructively discharged,"  *Powell v. Dep't of Educ. of City of New York*, No. 14-CV-2363, 2018 WL 4185702, at *6 (E.D.N.Y. Aug. 30, 2018) (quoting *Chanval Pellier v. British Airways, Plc.*, No. 02-CV-4195, 2006 WL 132073, at *4 (E.D.N.Y. Jan. 17, 2006)).

The defendant sent the plaintiff the following notice of termination on September 27, 2019:

> As of September 25, 2019, you have been absent from work for three (3) days without any notification.  Because your absence has not been approved and we have not heard from you, we have determined that you have abandoned your position.

> In accordance with our policy on absences and established company procedure, effective today, September 27, 2019 is the date of your termination.

(Pl. 56.1 ¶ 116; ECF No. 89-33.)  The parties agree that the plaintiff did not return to work after she left the meeting on September 19th.  (Pl. 56.1 ¶ 113.)  The parties also agree that the plaintiff told the defendant's representatives in the September 19th meeting to fire her, but they refused.  (Pl. Dep. 172:14-21.)  Nevertheless, the plaintiff insists that she did not abandon her job, because she was not a medical biller and thus could not have abandoned that job.  (Pl. Dep. 177:6-15, 193:17-23.)  Moreover, she claims that contrary to the defendant's termination letter, she told an HR representative that she would not be returning.  (*Id.*)

Under these circumstances, there is a material dispute of fact about whether the defendant terminated her employment.  First, the defendant's September 27th letter — labelled "Termination Letter" — is explicit that the plaintiff was terminated as of that date.  (ECF No. 89-33; Pl. 56.1 ¶ 116.)  This is strong evidence that the defendant terminated the plaintiff's employment.

Moreover, Witkowski testified at his deposition that the defendant would "assume voluntary termination" if an employee did not show up for work for three shifts in a row without explaining her absence. (ECF No. 89-4, Witkowski Dep. Tr. 178:2-9.)  It is possible that this is simply a question of semantics, and that "voluntary termination" is just another way to say, "she quit."  However, Vincenty-Rodriguez testified that "if there was no-call, no-show, that was a reason for termination" under the company's policy.  (ECF No. 89-8, Vincenty-Rodriguez Dep. Tr. 102:12-19.)  The plaintiff also maintains that she did not abandon any position with the defendant.

Granting the plaintiff the benefit of all conceivable inferences, a reasonable juror could find that the defendant fired the plaintiff.  The plaintiff "simply stopped coming to work," which typically would not "establish[] an adverse employment action."  *Rivera v. Stony Brook Pizza, LLC*, No. 24-CV-1260, 2025 WL 1726424, at *3 (E.D.N.Y. June 20, 2025) (cleaned up).  But the defendant decided to send a formal notice of termination.  *Cf. Ware v. L-3 Vertex Aerospace, LLC*, 833 F. App'x 357, 360 (2d Cir. 2020) (finding that a plaintiff voluntarily resigned where there was no evidence that he was terminated "[a]part from his own equivocal statements during his deposition").  As discussed below, the fact that the plaintiff did not return to her position as a medical biller may be a convincing legitimate, non-retaliatory justification for the defendant's

decision to terminate her, but it does not mean that the defendant did not terminate her. Accordingly, a juror could reasonably conclude that the defendant fired the plaintiff.[11]

### b. Causal Connection

A plaintiff can establish a causal connection between a protected action and retaliatory conduct either indirectly or directly. *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quoting *Littlejohn*, 795 F.3d at 319 (citation omitted)). "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 50 (2d Cir. 2025) (quoting *Tafolla v. Heilig*, 80 F.4th 111, 125–26 (2d Cir. 2023)).

The defendant learned about the plaintiff's NYSDHR complaint on September 11, 2019. (ECF No. 89-29 at 2.) The plaintiff transferred to the billing department six days later, and the defendant terminated her on September 27, 2019. "[A] rational jury could infer a causal connection from the roughly one-month period between [the plaintiff's] protected activity and her firing." *Knox*, 134 F.4th at 50.[12]

*        *        *

---

[11] The Court does not address the plaintiff's arguments that she was constructively discharged, because there is a material dispute of fact about whether the defendant terminated her.

[12] The defendant argues that "it is well established that temporal proximity alone is insufficient to allow a retaliation claim to survive summary judgment." (ECF 89-1 at 17.) The defendant relies primarily on *Zann Kwan v. Andalex Grp. LLC*, in which the Second Circuit held that "[t]emporal proximity alone is insufficient to defeat summary judgment *at the pretext stage*." 737 F.3d 834, 847 (2d Cir. 2013) (emphasis added). By contrast, courts have consistently held that a plaintiff may establish a causal connection in asserting a *prima facie* case of retaliation by showing a close temporal proximity between the protected activity and alleged retaliation. *See, e.g.*, *Banks*, 81 F.4th at 270 (explaining that a plaintiff's burden to establish a *prima facie* case is "minimal" and finding "that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action).

Accordingly, considering the record as a whole and drawing all reasonable inferences in the plaintiff's favor, she has established a *prima facie* case of retaliation.

## II.    Proffered Reason for Adverse Action

"Once the plaintiff has established a *prima facie* showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013).  The defendant's stated reasons for the alleged adverse actions are clear:  First, the defendant transferred the plaintiff temporarily so that she would not have to work in the allegedly discriminatory environment while the defendant investigated her allegations.  (ECF No. 89-1 at 18.)  Second, the defendant terminated the plaintiff after she did not report to work for three days.  (*Id.* at 19.)

## III.    Pretext

At the third step of the *McDonnell Douglas* framework, "a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Zann Kwan*, 737 F.3d at 845.  The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."  *Ricciardo v. NYU Hosps. Ctr.*, No. 22-CV-4952, 2025 WL 2208371, at *15 (E.D.N.Y. Aug. 4, 2025) (quoting *Bassi v. N.Y. Med. Coll.*, No. 23-278, 2024 WL 3717317, at *2 (2d Cir. Aug. 8, 2024)).  Courts need not evaluate "'the truth of the allegations against [the] plaintiff' but rather 'are interested in what *motivated* the employer.'"  *Id.* at *16 (emphasis and alteration in original) (quoting *Licinio v. New York*, No. 24-2564, 2025 WL 1693108, at *1 n.1 (2d Cir. June 17, 2025)).  "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have

21

occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.*  "[A]ny procedural irregularities" are also probative.  *King v. Aramark Servs. Inc.*, 96 F.4th 546, 565 (2d Cir. 2024).

The plaintiff says that the defendant's reason for her transfer to the billing department is pretextual because there is no evidence that the defendant investigated the plaintiff's allegations, apart from interviewing the plaintiff.  (ECF No. 91 at 19–20.)  For example, the defendant did not interview any of her supervisors.  (*Id.* at 19.)  Moreover, the record demonstrates that none of the defendant's employees seemed to know who was in charge the investigation or how it was unfolding.  Rapisarda believed that Witkowski was responsible, while Witkowski thought that Rapisarda was responsible.  (Pl. 56.1 ¶ 71.)  Because there was no substantive investigation, the plaintiff argues, there is a material dispute of fact about whether the defendant's stated reason for the transfer was pretextual.

The fact that the defendant's leadership team did not know who was in charge of the investigation does not mean that the defendant's proffered reason for the transfer was pretextual. The question for the Court is whether the defendant's "articulated purpose is the actual purpose for the challenged employment-related action." *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 246 (E.D.N.Y. 2010) (quoting *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993)).  Therefore, the Court must determine whether Witkowski suggested that the plaintiff transfer to the medical billing department so that she could continue to work for the defendant in an environment separate from the people she accused of discrimination, while the

defendant investigated her allegations, or whether he made that suggestion to retaliate against her for filing the complaint.

The plaintiff does not point to any evidence in the record to undermine Witkowski's stated reason for transferring the plaintiff. Whether or not Witkowski correctly understood the state of the investigation, who was in charge of it, or how long it would take is largely irrelevant. This is not a case where the defendant offered "what appears to be a *post hoc* explanation" for the employment action. *Rosalie v. Supreme Glass Co.*, No. 18-CV-2064, 2020 WL 6263311, at *7 (E.D.N.Y. Oct. 23, 2020). To the contrary, the record demonstrates that Witkowski suggested the "temporary situation" directly to the plaintiff. (Pl. Dep. 193:17-23.) In fact, Witkowski proposed various potential options to the plaintiff and acknowledged that he "need[ed] to figure out a way" keep the plaintiff working while the defendant investigated her discrimination claims. (ECF 89-30 at 31–32.) For instance, he told her she could have her a fulltime EMT job in Philadelphia "in an hour or two hours," where she would have nothing to do with any of the New York employees about whom she complained. (ECF No. 89-30 at 35.) When the plaintiff said she could not take that job, although she was interested in it, Witkowski returned to "figur[ing] out a way to get" her a role in the corporate office. (*Id.* at 36.)

Nor does the plaintiff claim that the defendant provided inconsistent or shifting reasons for the transfer. *Cf. Villetti v. Guidepoint Glob. LLC*, No. 21-2059-CV, 2022 WL 2525662, at *6 (2d Cir. July 7, 2022) (finding pretext where the defendant offered various reasons for terminating the plaintiff). In fact, the record is clear that Witkowski consistently stated the same reason for the transfer, and the plaintiff acknowledged that she understood the stated reason to be true. Under these circumstances, the temporal proximity of the protected action and adverse activity are not enough to establish that the defendant's reason was pretextual.

For similar reasons, the plaintiff has not shown that retaliation was a but-for cause of her termination. The defendant has consistently maintained that the plaintiff abandoned her job by not showing up to work for three consecutive days. This is the reason that the defendant cited in the September 27, 2025 termination letter. (ECF No. 89-33.) It is the reason that Witkowski gave for the plaintiff's "voluntary termination," (ECF No. 89-4, Witkowski Dep. Tr. 178:2-9), and it is consistent with Vincenty-Rodriguez's explanation that "if there was no-call, no-show, that was a reason for termination." (ECF No. 89-8, Vincenty-Rodriguez Dep. Tr. 102:12-19.)

The plaintiff does not point to any evidence that this basis for the plaintiff's termination was pretextual. Once again, the evidence in the record — even when viewed in the light most favorable to the plaintiff — does not evince any retaliatory motivation. To the contrary, the transcript of the plaintiff's September 19, 2019 meeting shows that the defendant did not want to fire the plaintiff on that day, immediately before she stopped coming into work. In fact, when the plaintiff told the defendant's representatives to fire her, they replied unequivocally: "I don't want to fire you," "you're not getting fired," "that's not on the table," "[y]ou didn't do anything to get fired at this point." (ECF No. 89-31 at 34–35.) Rapisarda even noted the plaintiff's excellent work in the medical billing department, stating that he's "not firing someone that[] . . . crushes 110 pages of documents." (*Id.* at 34.) The only thing that changed between the end of that conversation and the plaintiff's termination was that she stopped coming into work.

Because the plaintiff has not established that the defendant's legitimate, non-retaliatory reason for the adverse actions were pretextual, the defendant is entitled to summary judgement on the retaliation claim.

**CONCLUSION**

The defendant's motion for summary judgment is granted, and the case is dismissed.


**SO ORDERED.**

s/Ann M. Donnelly

_____

ANN M. DONNELLY
United States District Judge


Dated:  Brooklyn, New York
       September 19, 2025